UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
─────────────────────────────────────────────

DANIEL R. PAPELINO and MICHAEL YU,

                              Plaintiffs,

              - against -                                    5:01-CV-909

ALBANY COLLEGE OF PHARMACY OF UNION
UNIVERSITY, JAMES GOZZO, individually and as President
of Albany College of Union University, HOWARD D. COLBY,
individually and as Associate Dean for Academic Affairs,
ELISABETH VINES, individually and as Faculty Advisor to
the Student Honor Committee, and THOMAS DALTON,
individually and as Chairperson of the Appellate Board,

                              Defendants.

─────────────────────────────────────────────

**APPEARANCES:**                                    **OF COUNSEL:**

MACKENZIE HUGHES LAW FIRM                    JACQUELINE B. JONES, ESQ.
*Counsel for Plaintiffs Papelino & Yu*
101 South Salina Street
P.O. Box 4967
Syracuse, New York  13221-4967

ALBANY COLLEGE OF PHARMACY                    GERALD H. KATZMAN, ESQ.
OFFICE OF GENERAL COUNSEL
106 New Scotland Avenue
Albany, New York  12208-3492

**Norman A. Mordue, Chief U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

I.       INTRODUCTION

        The present case arises from a long history of acrimony and litigation between the involved

parties.  Presently before the Court is defendants' motion for summary judgment dismissing

plaintiffs' second amended complaint which asserts various state law causes of action as well as

claims for sexual harassment and retaliation under Title IX of the Education Amendments of 1972,

20 U.S.C. § 1681 ("Title IX").  The following constitutes the Court's decision in this matter.

II.    FACTUAL AND PROCEDURAL BACKGROUND

Since litigation of this matter has been protracted and has involved at least four attorneys retained on behalf of plaintiffs, the Court will briefly reiterate the facts and procedural history pertinent to plaintiffs' claims.  In May 1998, plaintiffs, Daniel Papelino and Michael Yu were enrolled as full-time pharmacy students at defendant Albany College of Pharmacy ("ACP"), and expected to receive their diplomas in June 1999.[1]  Through an administrative process, ACP made a determination in May 1998, that plaintiffs and Basile had violated ACP's student honor code by cheating in various courses during their tenure as pharmacy students.  As a result of the Student Honor Code Committee's administrative determination of cheating, plaintiff Papelino and Basile received failing grades in the classes they were found to have cheated in and were expelled from the college.  Plaintiff Yu received a failing grade in only one class and was offered the opportunity to repeat the class but was not expelled.

In September 1998, plaintiffs and Basile commenced an Article 78 proceeding in New York State Supreme Court challenging ACP's administrative determination and seeking reinstatement of their previous unblemished academic standing.  While the trial court upheld ACP's administrative decision, the Appellate Division, Third Department, reversed on January 11, 2001, finding no rational basis to support ACP's determination that plaintiffs and Basile had cheated.[2]  ACP's application for leave to appeal to the New York State Court of Appeals was

---

[1]  The Court granted the request of a third plaintiff, Carl Basile, former classmate of Papelino and Yu, to dismiss his claims against defendants in March 2007.

[2]  The Appellate Division's decision to set aside the Student Honor Code Committee's determination did not exonerate plaintiffs and Basile of the charges of cheating nor did it dispel ACP's suspicions regarding plaintiffs' guilt.  The appellate court merely held that ACP's administrative determination had no rational basis since the

-2-

denied on April 3, 2001.  ACP did not attempt to repeat Student Honor Code proceedings  against plaintiffs and Basile.  Rather, in April 2001, ACP awarded plaintiff Papelino and Basile their diplomas.[3]

Following the award of diplomas to Papelino and Basile, ACP advised them that the college would not certify their character, or personal, professional and ethical competence to any professional licensing authority.  Moreover, ACP advised plaintiff Papelino that it would not provide certification of his pharmacy education to the State of Florida Board of Pharmacy without attaching copies of the decisions of the Supreme Court and Appellate Division concerning the afore referenced Article 78 petition.  In addition, ACP advised Papelino that along with certifying the award of his degree in pharmacy to the Florida Board, the college would advise the Florida Board of the pendency of the present federal lawsuit which might "result in the revocation of Mr. Papelino's degree."  Defendant ACP did provide the Florida Board of Pharmacy with certification of plaintiff Yu's pharmacy degree and also apparently provided the New York Board of Pharmacy with certification as to plaintiff's Yu's character and fitness for professional licensing.

In May 2001, plaintiffs filed a complaint in New York State Supreme Court alleging various New York state law claims against defendants including breach of contract, negligent and intentional infliction of emotional distress and prima facie tort.  In addition, plaintiff Papelino sought compensatory and punitive damages against defendants for alleged sexual harassment and unlawful retaliation under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681

---

evidence relied on by the Committee was insufficient.  *See Basile v. Albany Coll. Of Pharmacy of Union Univ.*, 279 A.D.2d 770, 771-72 (3rd Dep't 2001).

[3]  ACP awarded plaintiff Yu his diploma in June 1999 after he was reinstated as a student.

("Title IX").[4]  To wit, plaintiff Papelino asserted that he was sexually harassed by a female professor at ACP and when he complained about it to the Dean of Students, he and his fellow plaintiffs were accused of cheating in retaliation for his complaint.  Plaintiff Papelino alleged that ACP further retaliated against him by refusing to certify his degree to the Florida Board of Pharmacy after he filed the present action under Title IX.

Defendants removed the action to federal court in July 2001. Plaintiffs filed an amended complaint in September 2001.  Plaintiff Yu alleged *inter alia* that defendants' various unlawful actions resulted in delay of his ability to become licenced as a pharmacist in New York State. Plaintiff Papelino alleged *inter alia* that defendants' various unlawful actions resulted in delay of his ability to become licenced as a pharmacist in Florida and/or any other jurisdiction.  In addition, plaintiff Papelino alleged that defendants discriminated against him unlawfully on the basis of his sex and retaliated against him after he took steps to protect himself from said discrimination. Plaintiff Papelino also sought to enjoin permanently defendants from taking further unlawful actions against him and compel ACP to issue certification of his degree in pharmacy to the Florida Board of Pharmacy without reference to any litigation concerning ACP's allegations of cheating.

In September 2001, plaintiff Papelino filed an Order to Show Cause seeking a preliminary injunction to compel ACP to complete the aforementioned Certificate of Pharmacy Education for the Florida Board of Pharmacy and to prohibit defendant ACP from adding information to and/or conditioning the Certificate.  Defendants moved to dismiss the amended complaint pursuant to

---

[4]  Title IX proscribes discrimination on the basis of gender in educational programs and activities receiving federal financial assistance: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . . "  20 U.S.C. § 1681(a).  Title IX has been construed to prohibit gender discrimination against both students enrolled in federally supported educational programs and employees involved in such programs. *See North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 520-34 (1982).

Rule 12(b) of the Fed. R. Civ. P..  The Court denied plaintiff's motion for a preliminary injunction and granted in part defendants' motion to dismiss each of the state law claims in the amended complaint as well as plaintiff Papelino's claim for sexual harassment based on a hostile education environment.  Plaintiffs' subsequent motion for reconsideration of the Court's decision to dismiss portions of the amended complaint was denied but the Court deemed plaintiffs' application as a motion for leave to file a second amended complaint and granted said request.

In March 2005, the Court granted in part and denied in part plaintiffs' motion to file a second amended complaint which revived two of plaintiffs' state law breach of contract claims, and two general tort claims against defendants.  Also remaining is one claim by plaintiff Papelino for *quid pro quo* sexual harassment and two claims of retaliation under Title IX.  In the March 2005, order, the Court denied defendants' then pending first motion for summary judgment without prejudice based on the filing of the second amended complaint.  In March 2007, the Court adopted a Report and Recommendation authored by Magistrate Judge David E. Peebles which recommended dismissal of plaintiff's claims against defendant Albert White, deceased former Associate Dean of Students at ACP based on plaintiffs' failure to move for substitution of an appropriate estate representative.  Defendants have now filed their second motion for summary judgment alleging various legal defenses to plaintiffs' claims.  Plaintiffs oppose defendants' motion.

III.    DISCUSSION

A.    Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  Substantive law

determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 258 (1986).  Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute.  *See id.*  The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325.

Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial.  *See* Fed. R. Civ. P. 56(e).  A trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought, *see Ramseur v. Chase Manhattan Bank*, 865 F.2d Cir. 460, 465 (2d Cir. 1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d Cir. 243, 249 (2d Cir. 1985).  It is with these considerations in mind that the Court addresses defendants' motion for summary judgment.

B.     Title IX Claims

In order to state a claim under Title IX, a plaintiff must allege that he has been "excluded from participation in, . . . denied the benefits of, or . . . subjected to discrimination under" any educational program receiving federal funding on the basis of gender.  20 U.S.C. § 1681(a). "Discrimination" is defined as disparate provision of programs, aid, benefits or services or inequitable application of rules or sanctions.  *See* 45 C.F.R. § 86.31.  It includes *quid pro quo* sexual harassment as well as claims for unlawful retaliation.  In a Title IX suit for gender discrimination, an educational institution may be held liable under standards similar to those

applied in employment discrimination cases under Title VII.  *See Torres v. Pisano,* 116 F.3d 625, 630 n. 3 (2nd Cir.), *cert. denied,* 522 U.S. 997 (1997); *Murray v. New York Univ. Coll. of Dentistry*, 57 F.3d 243, 248 (2d Cir. 1995).

1.      *Quid Pro Quo* Sexual Harassment

        In *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 753-54 (1998), the Supreme Court explained that "[w]hen a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII."  A tangible employment action, as defined by the Supreme Court, "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761.  *See also Wills v. Brown Univ.*, 184 F.3d 20, 25 (1st Cir. 1999) (defining *quid pro quo* harassment as occurring "when some benefit or adverse action, such as change in salary at work or a grade in school, is made to depend on providing sexual favors to someone in authority ....").

        The heart of plaintiff Papelino's *quid pro quo* claim is that Professor Nowak attempted to manipulate and coerce him into having a sexual or other relationship with her by making sexual advances and offering what he deemed unwarranted academic praise for his work.  In response, plaintiff Papelino asserts that he told Dean White about Nowak's alleged harassing conduct.  The Court presumes plaintiff Papelino's *quid pro quo* harassment claim is premised on the doctrine of respondeat superior or constructive notice; that is, his complaint to White is sufficient to render ACP liable for Nowak's actions under Title IX.

It is settled, however, that it would "'frustrate the purposes' of Title IX to permit a damages recovery against a school district for a teacher's sexual harassment of a student based on principles of respondeat superior or constructive notice . . . without **actual notice** to a school district official." *Gebser v. Lago Vista Independent Sch. Dist.*, 524 U.S. 274, 285 (1998).  Indeed, a damages remedy will not lie under Title IX "unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Id.* at 290.  In *Gebser,* the Supreme Court added:

> We think, moreover, that the response must amount to deliberate indifference to discrimination.  The administrative enforcement scheme presupposes that an official who is advised of a Title IX violation refuses to take action to bring the recipient into compliance.  The premise, in other words, **is an official decision by the recipient not to remedy the violation.**  That framework finds a rough parallel in the standard of deliberate indifference.

*Id.* (emphasis added).

Thus, to survive summary judgment on his *quid pro quo* sexual harassment claim, plaintiff Papelino must demonstrate that someone at ACP in a position of authority to remedy the alleged harassment was deliberately indifferent to his plight.  Plaintiff Papelino has failed to demonstrate that anyone employed by ACP, with the exception of former defendant Dean White, knew of Nowak's alleged harassment of him.  Thus, plaintiff's entire claim for *quid pro quo* harassment rests on the allegations that he informed Dean White regarding Nowak's offensive behavior and White did nothing to stop it.  These claims beg the questions - what did Dean White know about Nowak's alleged harassment of plaintiff and based on what he knew, did White's actions or inactions rise to the level of deliberate indifference?  There is a glaring absence of actual evidence

-8-

in the record concerning what plaintiff told Dean White during their one or possibly two alleged conversations concerning Deanne Nowak.  Throughout his opposition papers, plaintiff's counsel avers that he "reported the sexual harassment to Dean White."  This much is conceded by defendants.  But what, exactly, did plaintiff report?  The parties do not discuss or point to any evidence on this issue.  The Court observes that plaintiff Papelino appears to have assumed he presented proof on the subject and defendants have not questioned this presumption.

It is true that plaintiff Papelino testified at length about the various things Nowak allegedly did that he considered inappropriate as set forth in subparagraphs a-f of paragraph 116 in the second amended complaint.  Specifically, plaintiff Papelino asserts that in November 1997 Nowak gave him extra points on an exam when other students who petitioned for extra credit were denied.  Papelino alleges that Nowak told him that "not everyone" got extra points, they had "to earn them."  Papelino claims Nowak then said "[Y]ou know what I mean don't you Dan?" and that her comments  were "laced with sexual innuendo."   Papelino also asserts that in November 1997, Nowak gave him high praise for an essay he wrote whereas his classmates gave his work only mediocre reviews.  In January 1998, Papelino claims that when he asked Nowak for advice about a project, she said "I appreciate a man who is good with his hands, if you know what I mean."  Papelino also said Nowak told him "You know I am always here for you handsome."  On February 18, 1998, Papelino claims that Nowak "stroked" his "crotch area" during a meeting in her office and asked him if he knew "how lonely" she had been lately.  Plaintiff Papelino alleges that on March 23, 1998, Nowak asked him to remain after class and suggested they go to an ACP function together where she could "teach him to dance" and on April 6, 1998, Papelino asserts that Nowak asked him to go out with her to celebrate her birthday.

Plaintiff Papelino also testified that Nowak was constantly "smiling" and "winking" at him and giving him "sexual" looks that made him "uncomfortable."  Papelino said he felt uneasy when Professor Nowak sat on his table close to him while teaching a class and asked for his assistance in answering a chemistry question.  Papelino testified that due to the unwanted advances and attention from Nowak, he experienced nervousness, stress, acid reflux and difficulty sleeping.  Nevertheless, Papelino, along with his roommate, former plaintiff Basile, decided to make homemade fudge for Nowak and another professor before Valentine's Day in 1998.  Papelino was alarmed when, after summoning the courage to deliver the fudge to Nowak, she said really "melt[ed] for a man who knows how to bake."

The Court found Papelino's allegation that he informed Dean White of the above-referenced incidents sufficient at the pleading stage to state a claim for *quid pro quo* sexual harassment.  However, now that the case has proceeded to summary judgment stage, it is not readily apparent from the record that Dean White was aware or informed of any or all of the above incidents or other conduct referenced in Papelino's second amended complaint prior to the time Papelino elected to file a formal charge of sexual harassment with ACP.

After reviewing the entire record for evidence in any form of what information was presented by plaintiff Papelino to Dean White concerning Professor Nowak the Court notes the following:

\*      In the second amended complaint, plaintiff alleges that on April 6, 1998, he met with Dean White and "**explained in detail** the events of the past months and the improper, intimidating and harassing behavior of Professor Nowak which was causing him serious stress and interfering with his studies." (emphasis added).  The pleading further alleges that

-10-

"Dean White acknowledged the seriousness of the accusations and stated he would take

care of the situation."  The Court notes that the phrase "explained in detail" is conclusory.

Moreover, the second amended complaint is unverified and the allegations therein,

standing alone, are insufficient to defeat a summary judgment motion.

\*        During plaintiff Papelino's first deposition he was asked about his meeting with Dean

White on April 6, 1998.  Defense counsel asked "And the conversation that you say

happened occurred within his office?"  Papelino answered "Yes."  Plaintiff also testified

that he had a second conversation with Dean White "one or two weeks after" the initial

meeting on April 6, 1998.  Papelino testified that this second conversation took place "in

the hallway."  Papelino was not asked about nor did he offer any details concerning his

alleged conversation(s) with Dean White.

Papelino transcript, June 5, 2003, p. 102.

\*        Papelino was also asked if he had a belief as to why Professor Nowak "spearheaded"

cheating charges against him and he replied "Because I told Dean White.  I reported to

Dean White the events that took place."  Nowhere, however, does Papelino outline any of

the "events" he allegedly informed White about.

Papelino transcript, June 5, 2003, p. 108.

\*        During his second deposition, Papelino testified about his meeting with Dean White as

follows:

Q.        Now, isn't it correct that on April 6th when you told Dean
White about the situation, you told him to handle it without a
formal complaint?

A.        I did.

-11-

Papelino transcript, July 17, 2003, p. 34.  Nowhere in his testimony does Papelino elaborate on "the situation" that he allegedly discussed with White nor does he describe what was intended by the alleged agreement to handle the situation informally.

*       During his second deposition, plaintiff Papelino was again asked about his conversation with Dean White on April 6, 1998:

> Q.   When you spoke with Dean White, did he ever say anything to indicate that he had been aware of the alleged conduct?

[objection by plaintiff's counsel]

> Q.   At any time.  At the April 6th, the first time.

> A.   The first time I spoke to Dean White?

> Q.   Yes.  Did he say or do anything which led you to believe that he had been aware of the alleged conduct?

> A.   That I can recall, no.

Papelino transcript, July 17, 2003, pp. 26-27.

*       In plaintiff Papelino's verified response to defendants' second set of interrogatories, he asserts that he "ma[d]e a sexual harassment complaint to Dean White on April 6, 1998. When Dean White told [him] he would resolve the problem with Nowak, [he] felt somewhat relieved."  Again, however, the Court notes that the phrases "sexual harassment complaint" and "the problem with Nowak" are vague and/or conclusory.

*       In the unverified, uncertified, unauthenticated transcript of a secretly recorded conversation that occurred on May 8, 1998, between Daniel Papelino, Carl Basile and Deanne Nowak, Papelino is alleged to have asked Nowak in connection with her having raised cheating charges against plaintiffs, "I mean, all this because I told Dean White?"  Assuming the

-12-

Court were to overlook the evidentiary deficiencies in the transcript, the glaring question "Told Dean White what?" is not answered.  Nor in the transcript does Nowak answer or comment on Papelino's statement regarding Dean White.

* During his deposition when questioned about his conversation(s) with plaintiff Papelino, Dean White stated he prepared a two-page document, dated April 6, 1998, representing notes of what he and Papelino discussed.  Dean White referred to and was asked about this document (Exhibit #17) during his deposition.  However, these notes are not in the record submitted by the parties.

* Dean White testified that he prepared a document entitled "summary notes," on May 21, 2001, after receiving a copy of plaintiffs' original complaint.  These notes have been submitted by the parties and are authenticated.  They are in proper evidentiary form inasmuch as they were identified by Dean White during his deposition.  Two copies of White's "summary notes" were marked during his deposition as Exhibits 18 and 19.  Dean White was not questioned about these documents in detail during his deposition, but he did testify that the numbered "items" listed in the notes corresponded to the paragraph numbers of plaintiffs' original complaint and that notes next to each number were his "comments" about the allegations in the enumerated paragraphs.  To wit, with regard to paragraph 65 of the complaint, Dean White commented about plaintiff Papelino's allegation that he (White) said he would "take care of the situation."  White wrote that he "informed Papelino of ACP's procedure in regards to use of Faculty Ombudsman person.  Students being treated unfairly by faculty."  Later in these "summary notes," Dean White wrote in connection with paragraph 82 of the original complaint that "Plaintiff not informed of sexual

-13-

harassment procedure.  Informed about Ombudsman by White."  With respect to paragraph 83 of the complaint, Dean White noted "Did not investigate (White)  No written report of incidents turned in to Associate Dean as requested and required."  As to the allegations in paragraph 88 of the complaint, Dean White wrote "Did not speak to Prof. Nowak about complaints (White).  No other investigations.  Not involved (White)."  Finally, in regard to the allegations in paragraph 91 of the original complaint, Dean White noted "Never actively participated in Honor Code Hearing.  No knowledge of extent of sexual harassment problems.  Proposition, etc."

Dean White seemed confused during portions of his deposition about dates and the order of events, and when he learned of Papelino's complaint of sexual harassment.  For example, while he testified that he spoke to plaintiff Papelino on April 6, 1998, in the hallway at ACP, and that this was the "first time [he] knew about the harassment," he also testified that he knew "nothing about the harassment thing until after [the Honor Code proceeding which occurred in May 1998] was all done . . . after [he] knew that they were found guilty."  White transcript, pp. 21, 28.  White also testified that he was "not aware" he had been designated as a witness by ACP to testify about a claim of sexual harassment made by plaintiff Papelino against Professor Nowak:

> Q.    You're not aware of that?
>
> A.    Not at all.  Did not know that until he saw me in the hallway. And I kept it quiet from there.
>
> Q.    "And I" what?
>
> A.    (cont'd.)  Kept it quiet from there, expecting a report, which I never got.

-14-

> Q.      You kept it quiet after Mr. Papelino spoke to you?
>
> A.      Yes.  I never spoke to anybody.

White transcript, p. 22.

*       When asked about his "appointment" with Papelino to discuss Nowak, Dean White

testified as follows:

> Actually I was approached in the hallway, not an appointment.  I was
> coming out of the bathroom, he said "I would like to talk to you for a
> few minutes."  That's the first time I knew about the harassment.
>
>                                    . . .
>
> Well he was telling me -- he told me about Deanne Nowak.  And his
> contacts with her.  What I tried to do when I talked to him was to
> advise him the next step what he should do.  And no mention
> anyplace that he has made anything about my talk with him, with Dr.
> Colby or with Dr. Denuzo about what he should do.  To talk to them.
> Because I didn't know what was going on myself for a while there.
> And Colby is the -- was Director of the Faculty, if you have trouble
> with the faculty you talk to him.  Denuzo was Ombudsman and if
> you have trouble with a teacher you should talk to him.  If you can't
> get along with a teacher or if there's a problem or a conflict, then he
> would -- he would try to find out the case.  Go through the case and
> check the facts and make a suggestion.  Those were the two
> suggestions.  And that's what I talked to him mostly.  And also,
> about the report.  I said "I have nothing here.  I have nothing from
> Deanne Nowak.  I have not one word from her."  I didn't know what
> in the world was going on there.

White transcript, pp. 29-30.

*       White was confused when asked to explain why he wrote in his April 6, 1998, notes of his

meeting with Papelino that Papelino should "see President Gozzo," when defendant James

Gozzo did not start as president of ACP until July 1998.  White transcript, p. 30.

*       When asked specifically during his deposition to state what plaintiff Papelino had told him

about the alleged harassment, Dean White testified as follows:

> Q.      Did Mr. Papelino, during the conversation you say took place

-15-

in the hallway, give you some specific examples of what he said Professor Nowak was doing that was objectionable to him?

A.   He says to me -- I didn't really understand it, she was giving him favorable marks because of actions.  I don't know what the -- we didn't talk too much about that.  And where I mentioned here something about a blouse or something.

Q.   Do you recall if he said to you that she had directed some objectionable comments.

A.   No.

Q.   You don't recall?  Do you recall if he complained to you that she had touched him in an intimate part of his body?

A.   I don't recall that.

Q.   Do you recall if he objected to you that she had invited him to be her companion at social events.

A.   I think he did -- I do recall something about dinners or something.  Or going out.

White transcript, pp. 31-32.

*      White insisted he had only one conversation with plaintiff Papelino about Deanne Nowak and that it occurred in the hallway outside the men's bathroom.  He denied speaking with Papelino on another occasion or meeting with him in his office and denied emphatically telling Papelino that he would speak or had spoken to Professor Nowak:

Q.   Now Dean White, did you ever after the April 6, 1998 conversation with Mr. Papelino, go to Professor Nowak to discuss Mr. Papelino's allegations?

A.   I never talked to Professor Nowak on any of this.  I never called her, never wrote to her.
                              . . .
A.   I never had a conversation in my office with Mr. Papelino.  I had a conversation outside of the lavatory for ten minutes.

-16-

Fifteen minutes.

. . .

Q.     He alleges that during the conversation in your office that you asked him if you [sic] would like him to speak to Professor Nowak and that he was agreeable to that.  Do you recall that, sir?

A.     No way, and you ask Deanne . . .

. . .

Q.     Mr. Papelino, in substance, alleges that there was a second conversation in the hallway where you advised him you had spoken to Professor Nowak and the matter had been taken care of.

A.     I have not spoken to Deanne Nowak since she's left here.

Q.     Could you be mistaken?  Could there possibly . . .

A.     No.  No way, because - - I just didn't.

Q.     There's no way there could have been two conversations?

A.     No way.

Q.     Is there any way you could be mistaken in your recollection, sir?

A.     No.

White transcript, pp. 45, 48, 49-50.

*     It is undisputed that Dean White sent a note or copy of his notes to James Gozzo, president of ACP, concerning his interaction with plaintiff **after** the instant litigation was commenced.  However, White denied speaking to any other member of the ACP administration about his conversation with Papelino:

Q.     . . . [B]efore the memo to Gozzo . . . you never discussed the conversation with Mr. Papelino with any member of the administration?

-17-

> A.      I did not, an I did not receive any information from Mr. Papelino.
>
> Q.      Other than in the conversation?
>
> A.      That's right.  That's all.  That was the end of it.
>
> Q.      What I'm asking you, is there a reason that you didn't go to any member of the administration?
>
> A.      'Cause I didn't want to let it out.

White transcript, p. 47.  The Court notes that White was not asked, nor did he elaborate on what he meant when he said he did not want "it" to get out.

\*      In corroboration of White's "summary notes" wherein he wrote that when he spoke to Papelino on April 6, 1998, he told Papelino to submit a report to the Associate Dean, White testified that he remembered going to "the teachers . . . asking them if he - - Papelino - - if he had talked to them."  White testified that he asked his colleagues, "Did you receive a report on this?" and "They said absolutely not, they never saw him."  White transcript, p. 46.

> Q.      And that would be Professor Denuzo we're talking about?
>
> A.      And Colby.
>
> Q.      And also Dean Colby?
>
> A.      Yes.
>
> Q.      When did the conversation take place between yourself and Professor Denuzzo?
>
> A.      I imagine a couple of weeks.
>
> Q.      Couple weeks after the April 6 conversation?

[objection by defense counsel]

-18-

Q.      Well, a couple weeks after what?

A.      After I had sent the notice to the president.  I wanted to find out if he had done anything.  Had he made any steps at all, himself, to give information on this.

*        Later during his deposition, White was asked about a letter from Papelino to ACP which

outlined his claims of sexual harassment:

Q.      Now I'll represent to you that what 21 is a letter from Mr. Papelino dated February 9, 2001, addressed to the college and some attachments which together comprise a complaint against Professor Nowak regarding allegations of sexual harassment.  The attachments have what amounts to a list of allegations.  Did you have a chance to go through those?

A.      I read through them.

Q.      Do you recall as you sit here today, did Mr. Papelino discuss any of the matters outlined in that list with you during your conversation of April 6, 1998.

A.      No.  I don't know any of these things.

Q.      Well, I don't mean to be smart with you but I just want --

A.      Fudge.

Q.      I just want to be clear on what your answer is.  Do you not recall or are you saying he didn't discuss them with you.

A.      I don't recall.  Let's go back on that because I don't really know.

White transcript, pp. 54-55.

*        White used the phrase "sexual harassment" as opposed to "the harassment" only once in

connection with his interaction with Papelino:

A.      The only time that I - - on sexual harassment came and we talked down the hallway.

-19-

> Q.     I want to be clear who you're talking about that you talked
>        to.
>
> A.     Dan.

White transcript, p. 60. The language is obviously ambiguous. Indeed, while the passage could be

interpreted as suggesting that the "only time" White and Papelino talked about "sexual

harassment" was "down the hallway," it could also mean that the sexual harassment charge

"came" or was made to someone else and then White and Papelino talked in the hallway. In either

event, this portion of the transcript does not demonstrate that White spoke to Papelino about

**sexual** harassment on April 6, 1998, as alleged in the second amended complaint, particularly

since White either misspoke or failed accurately to recollect whether his conversation in "the

hallway" with Papelino about "the harassment" occurred before or after the Honor Code

proceedings and plaintiff's counsel never clarified this point in the transcript.

\*      White also denied that he was ever concerned about a connection between the alleged

harassment complaint and the cheating charges raised against plaintiffs:

> Q.     Given the fact that Mr. Papelino had come to you in April of
>        '98 to complain about Professor Nowak, did you ever have
>        any concerns raised in your mind about whether cheating
>        charges against Mr. Papelino might be in the nature of
>        retaliation.
>
> A.     No.
>
> Q.     Did you ever have any concern raised in your mind that the
>        cheating charges against Mr. Papelino might be related to his
>        allegations against Nowak.
>
> A.     No.

White transcript, p. 77.

As evidenced from the above, nowhere in any of his three deposition transcripts does

plaintiff Papelino testify about the content or details of his alleged conversation(s) with Dean White, nor has he submitted an affidavit on this subject.  Although plaintiff **alleges** he told Dean White about the details of his complaints about Nowak on April 6, 1998, there is no evidence in the record that Dean White understood clearly **at that time** plaintiff was complaining about **sexual** harassment.  Indeed, in his sworn testimony, Dean White provided little, if any detail, concerning the nature of Papelino's complaints regarding Professor Nowak.   Dean White testified that April 6, 1998, was the first time he knew anything about "the harassment."  Based on what Papelino told him, White made "suggestions" to Papelino: if he was having "trouble" with a faculty member, he should talk to Dean Colby; if he was having "trouble" with a teacher he should talk to the faculty ombudsman, Dr. Denuzo.  Specifically with respect to Dr. Denuzo, White testified "[i]f you can't get along with a teacher or if there's a problem or a conflict, then he would -- he would try to find out the case."  There is nothing about this testimony that suggests Papelino was complaining about sexual harassment as opposed to  "being treated unfairly by faculty" as referenced in White's "summary notes."

There is also an absence of evidence, or conflicting evidence, regarding whether White knew about the sexual harassment claim before the Honor Code proceedings began or after.   But even if the discordant portions of Dean White's testimony can be deemed evidence that he understood Papelino was complaining about some degree or type of "sexual harassment" by Professor Nowak **before** Papelino filed a formal complaint, there is no evidence that Dean White was aware of the alleged details, nature or gravity of the harassment.  White wrote in his summary notes that he had "no knowledge of the extent of sexual harassment problems.  Proposition, etc." White testified he did not know that Nowak had allegedly propositioned Papelino, made

-21-

objectionable comments, or touched him inappropriately.  Rather, White "didn't really understand" what Papelino was complaining about during their brief meeting and could recall no specifics other than "something about a blouse" or "dinners or something . . . [o]r going out." These comments were plainly insufficient to alert White to the possibility that Nowak was involved in active, aggressive and ongoing sexual harassment of a student.  The fact that White gave Papelino two suggestions concerning staff members at ACP he could talk to about the "problem" he was having with Nowak and that these staff members - Denuzzo and Colby - had different titles and responsibilities - together with the fact that White testified and wrote in his notes that he awaited a further report from Papelino, indicates that White did not know or understand the details of Papelino's complaint.

What is clear from the record is that it is patently unclear what Papelino told White and what White knew about Papelino's problem with Nowak.  It is also evident that whatever it is that Papelino told White about Nowak on April 6, 1998, Papelino said he wanted it handled "without a formal complaint."  Although Papelino alleges in the second amended complaint that Dean White told him he would take care of the situation with Nowak - a charge denied flatly by White - and plaintiff testified that Dean White said he "spoke" to Nowak, there is no evidence in the record of what White supposedly said.  It would amount to sheer speculation for the Court to assume when Papelino said White told him he "spoke" to Nowak, White meant he talked to her about her alleged sexual harassment of Papelino.  Papelino testified he could tell from Nowak's behavior and "attitude" after April 6, 1998, that things had changed -  Nowak did not wink at him or smile nor did she make eye contact with him in class.  Even assuming the truth of plaintiff's allegations, there is no evidence to suggest that this alleged change of attitude was due to his complaint about

sexual harassment, as opposed to some other form of harassment.

Short of what he alleges Nowak knew about the harassment, plaintiff Papelino has not presented evidence that anyone at ACP had actual notice of his being victimized by Nowak specifically in violation of Title IX.  *See id.* at 291 ("Where a school district's liability rests on actual notice principles, however, the knowledge of the wrongdoer himself is not pertinent to the analysis.").  Deliberate indifference may be found either "when the defendant's response to **known discrimination** 'is clearly unreasonable in light of the **known circumstances,**'" *Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 141 (2d Cir. 1999) (emphasis added) (quoting *Davis Next Friend LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648 (1999), or when remedial action only follows after "a lengthy and unjustified delay," *Bruneau v. South Kortright Cent. Sch. Dist.*, 163 F.3d 749, 761 (2d Cir. 1998).  Under these circumstances, the Court is not persuaded that plaintiff Papelino has met the additional "evidentiary burden" required of a Title IX sexual harassment claimant on the issue of establishing actual knowledge of the harassment or deliberate indifference to it on the part of ACP.  *See Hayut v. State University of New York*, 352 F. 3d 733, 750 (2d Cir. 2003).

Even assuming White was an "appropriate person" with "authority to address" the alleged discrimination complained of by Papelino, *see Gebser*, 524 U.S. at 290, Title IX liability does not attach simply because a school "should have known" about sexual abuse, *see Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp.2d 387, 397 (E.D.N.Y. 2005) (quoting *P.H. v. Sch. Dist. of Kansas City, Mo.*, 265 F.3d 653, 663 (8th Cir. 2001) (citing *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 642 (1999)), and actual notice also "requires more than a simple report of inappropriate conduct by a teacher." *Id.* (citation omitted).  "Clearly, the institution must have **actual knowledge**

-23-

**of at least some incidents of harassment** in order for liability to attach," and "at minimum must have possessed **enough knowledge of the harassment** that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." *Id.* (quoting *Crandell v. N.Y. Coll. of Osteopathic Med.*, 87 F.Supp.2d 304, 320 (S.D.N.Y. 2000) (emphasis added).

White cannot be charged with having been "deliberately indifferent" to unknown or vaguely outlined facts or a generic claim of "sexual harassment."  Papelino had an obligation to inform White of the details of his complaint to trigger White's duty to act.  If Papelino did so in this case, it is not evident from the record.  Thus, plaintiff Papelino has failed to demonstrate that White's response, or alleged failure to respond to the complaint of harassment amounted to deliberate indifference.  Based upon the lack of evidence concerning both actual notice to ACP of an alleged Title IX violation and deliberate failure to remedy the violation, summary judgment on plaintiff Papelino's *quid pro quo* sexual harassment claim is warranted.

2.      Unlawful Retaliation

Plaintiff Papelino's second amended complaint alleges that Professor Nowak lodged charges of cheating against he, Basile and Yu and took steps to influence the proceedings of the Student Honor Code Committee only after he rejected her inappropriate advances and complained to the Dean of Students about her conduct.  Defendants contend that the cheating allegations had nothing to do with plaintiff Papelino's rebuff of Professor Nowak's alleged advances, particularly in view of the fact that **three** students were accused of cheating, not just plaintiff Papelino.  Moreover, defendants argue that with the exception of Professor Nowak, none of the faculty members or students involved in raising cheating allegations, prosecuting the charges or deciding

-24-

plaintiffs' fate, knew anything about the alleged sexual harassment claim by plaintiff Papelino.  In a second retaliation claim, plaintiff Papelino alleges that ACP has continued to punish him for filing the present lawsuit by refusing to certify his academic credentials or otherwise assist him in securing professional employment in Florida.

To allege a prima facie case of discriminatory retaliation under either Title VII or Title IX, a plaintiff must allege facts showing, *inter alia,* (1) that defendant took adverse action against the plaintiff after becoming aware of his protected conduct, e.g., reporting sexual harassment by an instructor, and (2) that "a causal connection existed" between the plaintiff's protected activity and the adverse action."  *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir. 1993).  In order to make out a Title IX claim based on an educational institution's allegedly discriminatory motivation in taking disciplinary action against a student, the complaint must set forth a "particularized allegation" relating to a causal connection between the flawed outcome and unlawful discrimination, such as "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making" that also tend to show the influence of unlawful discrimination.  *Yusuf v. Vassar College,* 35 F.3d 709, 715 (2d Cir. 1994). The causal connection needed for proof of a retaliation claim "'can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'"  *Cifra v. G.E. Co.*, 252 F. 3d 205, 217 (2d Cir. 2001) (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)) (balance of citation omitted).

a.    Retaliation as Motive for Determination of Cheating

Papelino does not present evidence, or even suggest, that anyone involved in the Honor Code proceedings, including Nowak, made a direct statement or comment indicating a retaliatory

motive for the disciplinary action by ACP.  The problem with Papelino's first claim for retaliation

thus lies in his attempt to use only indirect proof - that is, the timing of the cheating allegations - to

establish a causal connection between his alleged rejection of Nowak's advances and/or his

complaint to White and the Honor Code proceedings which ultimately concluded with a finding

that plaintiffs had cheated.  While the Court can readily acknowledge Papelino has established

Professor Nowak - who is not named as a defendant - took adverse action against him after he

rejected her advances and/or complained to White, it cannot be said that any of the named

defendants were so influenced.

It is undisputed that no one on the Honor Code Committee which initially considered the

cheating charges brought by Nowak and other professors or the student panel which ultimately

decided plaintiffs' case knew anything about Papelino's sexual harassment complaint.  Papelino's

vague claim that White "must have" told them is unsupported by any evidence.  The record does

not even bear out Papelino's claim that Dean White knew his problem with Nowak involved

sexual, as opposed to some other form of harassment.  Indeed, as referenced above, it is not clear

whether White knew about the sexual harassment claim before the Honor Code proceedings began

or only learned about it "in the hallway" from Papelino after the cheating charges had been

adjudicated.  And even assuming White knew Papelino was concerned about possible sexual

harassment by Nowak **before** she brought cheating charges against him, there is no evidence in the

record establishing White was aware of the details and nature of Papelino's sexual harassment

complaint.  Nevertheless, to the extent that Dean White can be deemed to have had any

knowledge, however vague, of the sexual harassment complaint against Nowak, it is also

undisputed that he played no part in and had no influence on the Honor Code proceedings.

There is no doubt that the **timing** of Nowak's decision to **bring charges** of cheating against Papelino is questionable based on Papelino's allegations that he rejected Nowak's advances and complained to White one month before being charged with cheating.  Nowak's motive, however, is irrelevant to the ultimate determination of the Honor Code panel which elected to proceed with disciplinary action **against all three originally named plaintiffs** after review of the evidence submitted by Nowak and other professors with **no knowledge** of the alleged sexual harassment or Papelino's complaint to White.  Plaintiffs allege that the various professors who brought cheating charges were influenced and directed by Nowak.  However, all faculty witnesses who testified about the cheating charges in this case stated they believed plaintiffs had cheated and none knew anything about the alleged sexual harassment complaint by Papelino.

Nowak's motive in raising charges of cheating against plaintiffs is likewise irrelevant to the ultimate determination of guilt made by the student panel assembled to hear plaintiffs' case.  To wit, the panel heard and saw evidence that plaintiffs test results in multiple courses **not** taught by Nowak were suspect, particularly insofar as the appearance of the same peculiar wrong answers and math errors on exams.  Plaintiffs do not demonstrate or even allege that all of their allegedly suspicious test results were manufactured by Nowak.  Indeed, plaintiffs' position during the Honor Code proceedings was that they had similar test results because of the unique manner in which they studied as a group for exams.  The charges of cheating were raised by multiple professors against multiple students and involved evidence of cheating beyond anything that this record demonstrates could have been manufactured by Nowak.  Most notably, none of the involved decision makers had any knowledge of Nowak's alleged harassment of Papelino and his alleged

complaint about it.

Thus, the Court finds that the timing of the cheating charges, standing alone, is not sufficient to sustain plaintiff's burden of demonstrating a causal connection between his rejection of Nowak's advances or his complaint about the alleged harassment and the subsequent disciplinary proceedings. *See Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (holding that lack of knowledge on part of agents who carried out adverse action is evidence of lack of causal connection, but plaintiff may counter with evidence that decision maker was acting on orders of superior who had requisite knowledge); *see also Gordon v. Marquis*, 3:03-cv-01244 (AWT), 2007 WL 987553, at *10 (D.Conn., Mar. 31, 2007) ("[a] causal connection cannot exist if the person allegedly responsible for the adverse action had no knowledge of the protected activity"); *Golub v. City of New York*, 334 F.Supp.2d 399, 409 (S.D.N.Y. 2004) (holding that "temporal proximity between [the alleged retaliator's] knowledge of a protected activity and an adverse employment action may be sufficient to establish causal connection or retaliatory motive in some cases"); *Kalb v. Wood*, 38 F.Supp.2d 260, 268 (S.D.N.Y.1999) (finding no causal connection between filing lawsuit against the town and denial of compensation benefits when the manager responsible for the adverse employment action was not aware of the lawsuit). Plaintiffs' submission of unsworn, unauthenticated statements by persons who observed the Honor Code proceedings and claimed that Nowak attempted to unduly influence the student panel is insufficient to establish that the decision makers in this case were, as Papelino alleges, "acting explicitly or implicit on the orders" of Nowak. There is simply no evidence that the Honor Code committee or student panel were influenced by a retaliatory motive in reaching a conclusion that plaintiffs had cheated.

As a further matter, even if Papelino had established the requisite causal connection, Title IX retaliation claims are analyzed using the same "burden-shifting" framework set forth for Title VII cases by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See AB ex rel. CD v. Rhinebeck Cent. Sch. Dist.*, 224 F.R.D. 144, 153 (S.D.N.Y. 2004). If a plaintiff presents evidence of a *prima facie* case of retaliation, the burden shifts to defendant who must offer a legitimate non-discriminatory reason for its actions. *See Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). If the defendant puts forth such a reason, the plaintiff must demonstrate that there is sufficient evidence for a reasonable fact finder to find that the reason offered by the defendant is a mere pretext for discrimination. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).

In the present case, it is undisputed that defendants have proffered a legitimate, non-discriminatory explanation for the disciplinary action against plaintiffs - that is, a sincere belief that they cheated. Although Papelino has presented evidence that Nowak's actions may have been a pretext for discrimination, she is not a named defendant in this case. To the extent that Dean White may be deemed to have been aware of some degree of concern on the part of Papelino about "sexual harassment" there is no evidence that White knew the charges of cheating against the three plaintiffs - charges that were ultimately validated by the student Honor Code panel - were motivated by animus toward Papelino. Nowak's unlawful motives may not be imputed to ACP via the Honor Code panel or the named defendant faculty members in the absence of allegations, much less proof, that they were aware of the intent to discriminate and that their actions were pretextual.

2.      Retaliation as Motive for "Qualified" Certification of Papelino's Academic Record

-29-

To survive summary judgment on a Title IX retaliation claim, a plaintiff must "produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action].'" *Weinstock*, 225 F. 3d at 42 (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996) (balance of citation omitted).  "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination.  To get to the jury, '[i]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993)).

Plaintiff Papelino alleges that approximately one week after he commenced the present litigation, ACP refused to certify his degree and academic record to the Florida Board of Pharmacy without attaching the court decisions from plaintiffs' underlying Article 78 proceeding which challenged ACP's administrative determination that plaintiffs had cheated.  Again, Papelino relies on indirect evidence - timing - to prove a causal connection between the filing of the instant lawsuit and the refusal to provide an "unqualified" certification of his academic record.  Papelino argues that ACP changed substantially its proffered reason for refusing to provide an "unqualified" certification.  Further, Papelino argues that no other student was subjected to a similar "independent review" after a disciplinary determination by the Honor Code panel or appellate board.  Finally, Papelino insists that because the cheating determination was "annuled" by the Appellate Division, ACP had no basis, other than unlawful retaliation for communicating its belief plaintiffs had cheated to state licensing authorities.

-30-

Indeed, at the time ACP determined it would not complete the academic certification form for the State of Florida without advising the Board of Pharmacy about the Article 78 proceeding, defendants' counsel explained that "[i]t may be determined in a pending court action commenced by Papelino that the charges [of cheating ] were true which may result in the revocation of Mr. Papelino's degree." Five months later, in opposition to a motion for a preliminary injunction requiring ACP to provide an "unqualified" certification, defendant Gozzo, President of ACP, averred that the college was obligated to bring the underlying proceedings to the attention of licensing authorities because to do otherwise "would not only demean the degrees awarded to others, but would hide from the appropriate licensing authorities information which would enable them to make a knowing and intelligent determination with respect to whether to license Mr. Papelino."

The Court does not find ACP's actions in this regard create a material question of fact concerning pretext on the part of ACP in refusing to certify Papelino's academic record without qualification. As referenced in an earlier decision by this Court, the fact that the Appellate Division found that ACP's administrative cheating determination was procedurally flawed did not assuage ACP's belief that plaintiffs had cheated, nor did it invalidate the evidence relied on by the student Honor Code panel in reaching a conclusion that cheating had occurred. Thus, even if ACP is deemed to have "changed" its stated reason for advising licensing authorities of the underlying cheating case, **both** reasons are legitimately non-discriminatory and reveal no evidence of pretext. To wit, it was mistaken, though reasonable for defense counsel to assume the present litigation would revisit the issue of whether plaintiffs cheated on the merits and it is also reasonable for ACP to have concerns about the consequences of not advising state licensing authorities that plaintiffs

-31-

may have obtained their degrees via cheating.

Moreover, although he claims disparate treatment insofar as the manner in which ACP handled academic certifications for other students subjected to disciplinary action, he does not aver that ACP provided unqualified academic certification for a student similarly situated to **him**.  That is, there is no evidence that ACP gave an unqualified certification to a student expelled for cheating in circumstances where the college had been compelled to award a degree to that student based on procedural deficiencies in the underlying administrative disciplinary action.[5]  Further, Papelino cites no law, case, regulation, policy statement or contractual provision that would prevent an accredited college of pharmacy from advising state professional licensing boards of its belief that a student had violated the college's honor code even though a state appellate court reversed the determination of academic dishonesty on procedural grounds.  Because none of the facts relied on by Papelino demonstrate that ACP's stated reasons for refusing to provide an "unqualified" certification of his academic record to the State of Florida Board of Pharmacy was pretext for unlawful retaliation, this claim must be dismissed.

C.    State Law Claims

1.    Breach of Contract

Plaintiffs' first and third causes of action sound in breach of contract.  Contrary to plaintiffs' assertions, the doctrine of "law of the case" does not prevent the Court from revisiting the issue whether plaintiffs' contract claims survive defendants' motion for summary judgment. The Court's previous observation that "an implied contract arises" when a student enrolls at a

_____

[5] Though not cited as an example by Papelino, the Court notes that while ACP provided "unqualified" academic certifications for plaintiff Yu, Yu was **not** expelled and he repeated the courses he was found to have cheated in.  Thus, ACP's award of a degree to Yu upon his completion of required academic credits occurred under markedly different circumstances than the degrees awarded to Papelino and Basile.

university as well as the prior determination to grant plaintiffs' motion to file a second amended complaint in no way circumscribes the Court's present authority to analyze the legal viability of plaintiffs' contract claims before the case is deemed trial ready.

As referenced in the Court's previous decision in this case, the implied contract which issues when a university accepts a student for enrollment provides simply that if the student complies with the terms prescribed by the university, he will obtain the degree he seeks. *See Carr v. St. John's Univ.,* 17 A.D.2d 632, 633 (2d Dep't), *aff'd* 12 N.Y.2d 802 (1962); *see also Vought v. Teachers College, Columbia Univ.,* 127 A.D.2d 654, 654-55 (2d Dep't 1987). Implicit in this contract is that the university must act in good faith in dealing with the student. *See Olsson v. Bd. of Higher Educ.*, 49 N.Y.2d 408, 413-14 (1980). Also implicit is that the student must fulfill his end of the bargain by satisfying the university's academic requirements and complying with its procedures if he hopes to receive his degree. *Gally v. Columbia Univ.,* 22 F. Supp.2d 199 (S.D.N.Y. 1998).

The terms of the implied contract are supplied by the bulletins, circulars and regulations made available to the student. *See Clarke v. Trustees of Columbia Univ. of City of New York,* 1996 WL 609271, at *5 (S.D.N.Y. Oct. 23, 1996) (citing *Vought,* 127 A.D.2d at 655 ). "Thus, 'if the contract with the school were to provide for certain specified services, such as for example, a designated number of hours of instruction, and the school failed to meet its obligation, then a contract action with appropriate consequential damages might be viable.'" *Id.* (quoting *Paladino v. Adelphi Univ.*, 89 A.D.2d 85, 92 (2d Dep't 1982)).

Not every dispute between a student and a university is amenable to a breach of contract claim, however. Where the essence of the complaint is that the school breached its agreement by

-33-

failing to provide an effective education, the complaint must be dismissed as an impermissible

attempt to avoid the rule that there is no claim in New York for "educational malpractice."   *See*

*Andre v. Pace Univ.*, 170 Misc.2d 893, 896 (N.Y. App. Term 1996);  *Sirohi v. Lee,* 222 A.D.2d

222, 222 (1st Dep't 1995);  *Paladino,* 89 A.D.2d at 89-90.  Indeed, because determinations in such

cases rest "upon the subjective professional judgment of trained educators, the courts have quite

properly exercised the utmost restraint in applying traditional legal rules to disputes within the

academic community."  *Olsson,* 49 N.Y.2d at 413 (citations omitted).

> This judicial reluctance to intervene in controversies involving
> academic standards is founded upon sound considerations of public
> policy.  When an educational institution issues a diploma to one of its
> students, it is, in effect, certifying to society that the student possesses
> all of the knowledge and skills that are required by his chosen
> discipline.  In order for society to be able to have complete confidence
> in the credentials dispensed by academic institutions, however, it is
> essential that the decisions surrounding the issuance of these
> credentials be left to the sound judgment of the professional educators
> who monitor the progress of their students on a regular basis.  Indeed,
> the value of these credentials from the point of view of society would
> be seriously undermined if the courts were to abandon their
> long-standing practice of restraint in this area and instead began to
> utilize traditional equitable estoppel principles as a basis for requiring
> institutions to confer diplomas upon those who have been deemed to be
> unqualified.

*Id.* at 413-14.  Thus, the application of contract principles to the student-university relationship

does not provide judicial recourse for every disgruntled student.  *See id*.

Plaintiffs assert that defendants are liable to plaintiffs in contract for acting arbitrarily,

capriciously and in bad faith by *inter alia*: (1) subjecting plaintiffs to administrative review over

allegations of cheating; (2) delaying the award of diplomas to plaintiffs until final appellate

resolution of said administrative review; (3) delaying and/or refusing to certify plaintiffs' character

to professional licensing boards; and (4) refusing to certify plaintiff's attendance and receipt of

degrees to state licensing boards without also notifying said boards of the underlying history of the administrative disciplinary action taken by ACP against plaintiffs.

Plaintiffs allege that ACP violated their contractual rights as defined by the "rules, regulations and requirements" of the college.  Specifically, plaintiffs assert that the administrative review conducted by the Student Honor Code Committee failed to comply with provisions of the Student Handbook and Student Disciplinary Code in effect during the 1997-98 academic year at ACP.  In support of this claim, plaintiffs point to the following evidentiary points from the deposition of Elisabeth Vines, faculty advisor to the Student Honor Committee at the time cheating charges were raised against plaintiffs: 1) Members of the Honor Code Committee never met as a group to discuss the allegations against plaintiffs.  Rather, Ms. Vines contacted members individually either by telephone or e-mail; 2) Ms. Vines does not have any "evidence or documented correspondence" of conversations she alleges she had with members of the Honor Code Committee; 3) Ms. Vines did not have the student Honor Code panel randomly chosen for plaintiffs' hearing; 4) Ms. Vines did not recall if a "public announcement" was made before the Honor Code Committee was convened; 5) The only written document setting forth any type of cheating allegations was received by Ms. Vines from Proefessor Nowak on May 11, 1998; 6) The Honor Code Committee was convened prior to receiving the May 11, 1998, letter or any formal written accusations made against plaintiffs; and 7) Even though Ms. Vines told plaintiffs before the disciplinary hearing that there was no deadline or time limit on the presentation of evidence, plaintiffs were "prevented by Ms. Vines . . . from allowing their witnesses to testify regarding their opinion of the accuracy of Professor Nowak's charts" because "Ms. Vines cut plaintiffs off by screaming that the plaintiffs had to do their closing statement 'Now.'"

-35-

Even if the Court assumes that ACP failed to comply with the above-referenced procedural rules concerning the manner in which plaintiffs' disciplinary hearing was conducted, plaintiffs do not present any evidence that the alleged breach of these rules impacted and/or affected the specific contractual failures complained of herein - that is, ACP's determination that plaintiffs had cheated, the delay in awarding degrees, and the refusal to provide "unqualified" academic certification. Moreover, these alleged procedural failures are irrelevant since the result of the disciplinary hearing was ultimately reversed on procedural grounds by the Third Department. The Court can discern no authority for inferring that ACP's alleged failure to follow procedural rules in connection with a disciplinary hearing is evidence of a material breach of its implied contractual obligations to plaintiffs.

> Inextricably intertwined with the authority to set academic standards is the authority to set standards for ethical behavior. The university is entrusted to implement its ethical policies and to police its student body. As with academic criteria, the decision as to how to address allegations of cheating is best left to the professional educators and administrators who deal with such allegations on a regular basis.

*Gally,* 22 F. Supp.2d at 207.

Other than the above-referenced ministerial and/or procedural rules, plaintiffs have presented no evidence that ACP breached a substantive rule, regulation or policy in conducting the administrative review, delaying the award of plaintiffs' degrees, and refusing - in the case of plaintiff Papelino - to provide "unqualified" certifications of plaintiffs' academic credentials.[6] As stated in a previous decision in this case, courts are not in the business of substituting their

---

[6] The Court notes that Papelino's complaint about ACP's refusal to provide an "unqualified" academic certification to the State of Florida is distinct from refusal to provide any certification of his academic credentials. While the latter might be deemed a substantive breach of the related duty to award a promised degree to a student, the former merely reflects Papelino's dissatisfaction with the manner ACP chose to convey evaluation of his academic achievement.

judgment for that of professional educators concerning the time, place and manner for schools to meet their academic obligations to students.  There is no basis to conclude that ACP's decisions with respect to certifying student records involved anything other than the exercise of  academic discretion, unfettered by contract and unreviewable by courts. *Shields*, 77 A.D.2d at 869 (citation omitted)*; see also Babiker v. Ross Univ. School of Medicine,* 2000 WL 666342 at *6 (S.D.N.Y. May 19, 2000) (educational institutions are afforded considerable deference when making decisions concerning academic standards; therefore, in reviewing such decisions, courts are limited to determining whether defendants "'abided by their own rules, and whether they have acted in good faith or their action was arbitrary or irrational'") (quoting *Gertler v. Goodgold,* 487 N.Y.S.2d 565, 569 (1985)); *Garg v. Albert Einstein Coll. of Medicine of Yeshiva Univ.*, 747 F.Supp. 231, 236 (S.D.N.Y. 1990); *Clarke*, 1996 WL 609271 at *6.

Insofar as proof that ACP acted in a manner that was arbitrary or irrational, it is clear that even after exhaustive discovery, plaintiffs still rely solely on the determination of the Third Department concerning their Article 78 petition.  As previously noted, however, the question whether ACP's determination that plaintiffs cheated was legally sufficient according to New York administrative law is entirely distinct from examination of the nature of the contract, if any, that existed between plaintiffs and ACP.  While the former focuses on the adequacy of the procedure and evidence used to render an administrative decision, the latter involves review of the legal duties and obligations - express and implied - assumed by the parties when they began and continued the university/student relationship.  The Appellate Division's decision to set aside the Student Honor Code Committee's determination did not exonerate plaintiffs of the charges of cheating nor did it dispel ACP's suspicions regarding plaintiffs' guilt.  The appellate court merely

-37-

held that ACP's administrative determination had no rational basis since the evidence **relied on by the Committee** was insufficient.  *See Basile v. Albany Coll. Of Pharmacy of Union Univ.*, 279 A.D.2d 770, 771-72 (3rd Dep't 2001).

Based upon plaintiffs' failure to raise any questions of fact concerning ACP's breach of a substantive contractual duty in this case, plaintiffs' contract claims must be dismissed.

2.      Claims Sounding in Tort

Plaintiffs' second and fourth claims arise under state tort law.  Specifically, plaintiffs assert in the second cause of action that ACP is liable based on Dean White's alleged "negligent supervision" of Professor Nowak and his failure to investigate Papelino's complaint of sexual harassment.  As referenced above, there is no evidence that Papelino actually complained to Dean White on April 6, 1998, about "sexual harassment" by Nowak and even if he did, there is no evidence that Papelino provided any details of the alleged harassment to White, thus triggering an obligation to investigate.  Moreover, short of plaintiffs' conclusory allegations, there is no evidence in the record which demonstrates White had an obligation to "supervise" Nowak in any event.  As referenced above, the allegation in the second amended complaint that White told Papelino he would "take care" of "the situation" with Nowak is unsworn, not in proper evidentiary form and may not be considered by the Court insofar as defeating defendants' entitlement to summary judgment.  Moreover, the record demonstrates that White told Papelino there were at least two faculty members - Denuzzo and Colby - designated to handle student complaints about treatment by faculty, but there is no evidence that plaintiff submitted a report or complaint to either man about Nowak.

Plaintiffs' fourth cause of action is premised on defendants' alleged tortious interference with "precontractual relations and prospective economic advantage."  According to plaintiffs, once

-38-

the Appellate Division reversed the administrative determination of cheating by ACP, ACP's refusal to provide an "unqualified" certification of Papelino's academic credentials precluded him from practicing as a licensed pharmacist.  As already discussed in connection with plaintiffs' breach of contract claims, ACP did not refuse to provide certification outright.  Rather, plaintiff Papelino chose not to accept the type of certification ACP was willing to provide.  Again, there is no case, law, rule, regulation or policy that requires any educational institution to provide "unqualified" certification of a student's academic record, particularly in this case where ACP had made a determination that plaintiffs violated the school's Honor Code and that determination was overruled on procedural, rather than substantive grounds.  As a further matter, there is no evidence that ACP prevented Papelino from practicing as a licensed pharmacist.  That Papelino chose to forego the qualified certification offered by ACP is not dispositive of his claim that ACP's actions or inactions amounts to "tortious interference" with prospective employers.  Based thereupon, plaintiffs' fourth cause of action must be dismissed.

IV.    CONCLUSION

Based thereupon, it is hereby

ORDERED that the motion for summary judgment (Dkt. No. 163) is GRANTED; and it is further

ORDERED that the second amended complaint is DISMISSED with prejudice.

IT IS SO ORDERED.

Dated:  September 11, 2009
         Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge